**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GEORGE BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12 C 1764 |
| | ) | |
| CITY OF CHICAGO, et al., | ) | The Honorable Charles R. Norgle |
| | ) | Judge Presiding |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO THE**
**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Peter V. Bustamante
17 North State Street - Suite 1550
Chicago, Illinois 60602
(312) 346-2072
pvbust@bustamantelaw.com

## TABLE OF CONTENTS

**a. The Standard upon Motion for Summary Judgment** ------------------------------------------- 1

Fed Rule Civ. P. 56(a) ------------------------------------------------------------------------------- 1

*Holliman v. Thompson,* 2019 WL 1354377 *1 (N.D. Ill. 2019) ----------------------------------- 1

**b. Introduction** ------------------------------------------------------------------------------------ 1

U.S. DOJ Report, January 13, 2017, at justice.gov/opa/file/925846 at 79 ---------------------- 2

*People v. George Brown,* 2017 IL App (1st) 160025 ¶¶ 38, 59 --------------------------------- 2

*Ennenga v. Starns,* 677 F.3d 766, 773-74 (7th Cir. 2012) --------------------------------------- 2

*Cole v. Beck*, 765 Fed. Appx. 127, n.1. --------------------------------------------------------- 2

**c. Statement of Facts** ----------------------------------------------------------------------------- 2

**d. Argument** --------------------------------------------------------------------------------------- 10

**1. George was Wrongfully Detained for 334 Days, in Violation
of his 4th Amendment Right to be Free from Unlawful Detention** --------------------- 10, 11

*Manuel v. City of Joliet,* 137 S. Ct. 911, 918-20 (2017) ------------------------------------ 10

*Lewis v. City of Chicago,* 914 F. 3d 472, 477 (7th Cir. 2019) ------------------------------- 10

*People v. Brown,* 2017 IL App (1st) 160025 at ¶¶ 16, 31-37, 57 ------------------------------- 11

**2. George's Pretrial Detention was Unlawful** ----------------------------------------------- 12

*Brown,* 2017 IL App (1st) 160025, ¶ 41 --------------------------------------------------------- 12

*Manuel v. City of Joliet*, 903 F. 3d 667, 660670 (7th Cir. 2018) ------------------------------- 12

*Lewis,* 814 F. 3d at 476-77 --------------------------------------------------------------------- 12

*Hardy v. City of Milwaukee*, 88 F. Supp. 3d 852, 878-79 (E.D. Wisc. 2015) ---------------------- 12

720 ILCS 5/31-1(a) ------------------------------------------------------------------------------ 13

*People v. Jones,* 245 Ill. App. 3d 302, 304 (2nd Dist. 1993) -------------------------------------- 13

*People v. Johnson,* 94 Ill. 2d 148, 154-160 (1983) -------------------------------------------- 13

i

*People v. Holdman,* 73 Ill. 2d 213, 221 (1978) ------------------------------------------------ 13

**3. There is Evidence that Lopez and Moussa Fabricated Evidence** ----------------------------- 13

*Saccameno v. Ocwen Loan Servicing, LLC,* 2018 WL 124037 (N.D. Ill.) * 5-6 -------------------- 14

*Lewis v. City of Chicago,* 914 F. 3d 472, 476-77 (7th Cir. 2019) ------------------------------------- 14

*Avery v. City of Milwaukee,* 847 F. 3d 433, 439-40 (7th Cir. 2017) ------------------------------------ 14

*Brown,* 2017 IL App (1st) 160025 at ¶¶ 16; 31-38; 57 ------------------------------------------------ 14

**4.  George was Harmed as a Result of Fabricated Evidence, as**
**    well as Lopez' and Moussa's Other Actions** ------------------------------------------------------ 15

*Brown,* 2017 IL App (1st) 160025 ----------------------------------------------------------------------------- 15

*Manuel,* 903 F. 3d at 668-70 --------------------------------------------------------------------------------- 15

**5.  Moussa and Lopez are Not Immune from Their Actions** ------------------------------------------ 16

*Briscoe v. LaHue,* 460 U.S. 325, 334-40 (1983) ---------------------------------------------------------- 16

*Whitlock v. Brueggmann,* 682 F. 2d 567, 580 (7th Cir. 2012) ------------------------------------- 16, 17

*Starks v. City of Waukegan,* 946 F. Supp. 2d 780, 788-89 (N.D. Ill. 2012) ----------------------------- 16

*Phillips v. City of Chicago,* 2018 WL 1309811 (N.D. Ill.) *25 -------------------------------------------- 17

*Brown,* 2017 IL App (1st) 160025, ¶ 38 ------------------------------------------------------------------- 17

**6.  Contrary to their Assertions, the Defendants' Actions**
**    Constitute Intentional Infliction of Emotional Distress ("IIED")** ----------------------------- 17

*Feltmeier v. Feltmeier,* 207 Ill.2d 263, 269-75 (2003) -------------------------------------------- 17, 19

*Guerra v. Hunger,* 1998 WL 246399 * 1, 4-5 (N.D. Ill. 1998) ------------------------------------- 17, 19

*Pavlik v. Kornhaber,* 326 Ill. App. 3d 731, 736-38; 743-46 (2nd Dist. 2001) ------------------------ 18

*Pilotto v. Urban Outfitters West, LLC,* 2017 IL App (1st) 16044, ¶ 17 ---------------------------------- 18

*Weston v. Advocate Christ Med. Ctr.,* 2016 IL App (1st) 150935-U --------------------------------- 18

Ill. S. Ct. Rule 23(e) ---------------------------------------------------------------------------------------------- 18

**7. Lopez and Moussa Assaulted George**------------------------------------------------------------------- 19

*Smith v. City of Chicago,* 143 F. Supp. 3d 741, 760-61 (N.D. Ill. 2015)----------------------------- 19

**Conclusion**-------------------------------------------------------------------------------------------------------20

### a.     The Standard upon Motion for Summary Judgment

Summary judgment should only be granted when no material fact is genuinely disputed and the moving party is entitled to judgment as a matter of law. Fed Rule Civ. P. 56(a); *Holliman v. Thompson,* 2019 WL 1354377 *1 (N.D. Ill. 2019). When the facts are analyzed here, it is evident that genuine issues of material fact exist and the Defendants' Motion must be denied, in its entirety.

### b.     Introduction

At deposition, Officer Lopez testified that the only reason he stopped George Brown was because his SUV did not have its headlights on. (Ex. 3 at 81). Lopez's statement is in the arrest report was attested under penalty of perjury by Officer Moussa. (Ex. 15). Lopez also testified that George punched him in the face with a closed fist, (Ex. 3 at 48:16-18) so hard that he was stunned, (Ex. 3 at 49:3-5) and made him step back a couple of feet. (Ex. 3 at 49:11-17; *see, also,* Ex. 16, Tactical Response Report). (Plaintiff's Statement of Additional Facts "PS" ¶ 1).

Lopez's statements are fabrications. A Police Observation Device ("POD") video shows that George's SUV has its headlights on. (Ex. 7). He had no reason to stop George, much less to arrest him. The emergency room doctor that examined Lopez testified that there was no indication of injury on Lopez's face. (Ex. 20 at 106:13-23). (PS ¶ 2).

Lopez filed a criminal complaint, falsely charging George with aggravated battery to a police officer. (Exs. 8, 9). As a result his, bail was set at $100,000.00. (Exs. 17, 19). George spent 334 days in jail waiting for trial, where he was found not guilty of aggravated battery. (Ex. 5 at 79). (PS ¶ 3).

The reason for the fabrications is that, after George was detained, the defendants exacted some "street justice" by punching George, choking him, and tasing him four times. When a policeman uses excessive force and then covers his violence with false criminal charges, the false

charges are commonly known as "cover charges." (*See, e.g.,* U.S. DOJ Report, January 13, 2017, at justice.gov/opa/file/925846 at 79). That is the situation here. That is why in its opinion remanding for a new criminal trial, the Illinois Appellate Court stated:

> ¶38. So there were a lot of considerations that militated in favor of quashing the arrest. The significant inconsistencies in the testimony, especially in how the narrative of the arrest evolved after the POD camera video was discovered, raise some significant red flags. Viewing the video in conjunction with all the testimony in the record, *there are reasons to believe that the first car the officers confronted was defendant's car with its lights on and, therefore, that the officers lacked a legal basis to arrest defendant.*

> ¶59. While our precedent demands that we remand this case for a new trial based on the above-asserted problems with defendant's prosecution, we urge the State to consider whether retrial is really worthwhile. . . . This opinion is not vindication of the defendant in any way, *but it is clear that there are a number of problems with the case.*

*People v. George Brown,* 2017 IL App (1st) 160025 ¶¶ 38, 59, emphasis added.[1] As the Illinois Appellate Court noted, Lopez's and Moussa's accounts of what happened in their encounter with George on March 10-11, 2011, are riddled with inconsistencies. (*Brown,* 2017 IL App (1st) 160025, ¶¶ 16; 31-38; 57). Indeed, the POD video belies their accounts of this encounter. (*See,* Ex. 7). Thus, the Defendants' statement that "George cannot show that evidence has been fabricated or that he was deprived of liberty as a result," ignores the facts. (Defendants' Memo at 5). (PS ¶¶ 5-7).

**c.      Statement of Facts**

On March 10, 2011, at about 11:50 p.m., George Brown, driving a black SUV, picked up his friend, Grover Tucker, at Quincy Street, near the intersection with Laramie Avenue.[2] (Exs. 1 at 50, 6b at 24, 25). The vicinity of Quincy and Laramie is a high-crime area. (Exs. 2 at 11, 3 at

---

[1] This Court can take judicial notice of the state court criminal proceedings. *Ennenga v. Starns,* 677 F.3d 766, 773-74 (7th Cir. 2012); *Cole v. Beck*, 765 Fed. Appx. 127, n.1.

[2] In his deposition, George refers to Grover Tucker by his nickname, "Wee Baby." (*See, e.g.,* . Ex. 1 at 48).

8). Quincy is a narrow, one-way eastbound street with cars parked on both sides. (Exs. 1 at 64, 2 at 28). (PS ¶ 8).

The headlights to George's SUV were on. (Ex. 1 at 50, 52-3; 117). The headlights came on automatically. (Ex. 1 at 52-3; 117; *see also,* POD video, Ex. 7). As George was driving east on Quincy, a car made a right-hand turn from Laramie, going in the wrong direction onto Quincy; it stopped in front of George's SUV. (Ex. 1 at 53-5). This car blocked George's SUV; there was no way to get around it. (Ex. 1 at 57). The car beamed a bright light partially blinding George. (Ex. 6b at 8, 27). George could not see much with that light shining on him. (Ex. 6b at 7). According to Lopez, he aimed spotlights at the front windshield of George's SUV. (Ex. 6a at 132). (PS ¶ 9).

Lopez's car did not have its Mars Lights[3] on. (Ex. 6a at 167-70; Ex. 7). George did not see any Mars Lights or any police markings on the car. (Ex. 5 at 61; *see, also* Ex. 7). A man waved his hand, directing him to get out of the way, so, George backed up his SUV. (Ex. 1 at 57, 59, 61). His SUV could not back up very far on such a narrow street. (Ex. 1 at 63). Two men hopped out of the car with guns drawn, pointing straight at George. (Ex. 1 at 64). One of the men was screaming, "Get the fuck out of the car." (Ex. 1 at 64-6). These men did not appear to be police officers. (Exs. 1 at 66; 5 at 62). George did not realize that they were police officers until later, when he was at the hospital. (Ex. 1 at 178). (PS ¶ 10).

George panicked, jumped out of his car, and ran west on Quincy, away from the two men. (Exs. 1 at 58, 67; 4 at 62). Grover was snatched from the car, slammed to the ground and feet were placed on his back. (Ex. 18 at 42-43, 45). When he was on the ground, a police officer threatened to tase Grover. (Ex. 18 p. 65). At the criminal trial, Grover testified that when he first saw the car

---

[3] Mars Lights are signal-safety lights used in the United States and built by Mars Signal Light Company. (wikipedia.org/wiki/Mars_Light).

3

going the wrong way on Quincy, he did not realize they were police because they shined a bright light on the SUV and the men that jumped out of the car were dressed in black. (Ex. 6b, pp. 7-8). (PS ¶ 11).

George did not get very far because a blue and white police car was stopped in front of him as he was running west. (Ex. 1 at 72). When George saw the blue and white police car, he put a joint[4] in his mouth and chewed it. (Ex. 1 at 73, 77). Uniformed police officers got out of that police car. (Ex. 1 at 73, 77). (PS ¶ 12).

George was tackled; he landed on his side and balled up, *i.e.,* curled into a fetal position. (Ex. 1 at 74-5; 78-79). Someone punched him in the head several times and choked him. (Ex. 1 at 79, 80-82, 83, 86). The person punching George was dressed in black; at the time George did not think he was a police officer. (Ex. 1 at 81). No one told him to stop resisting. (Ex. 1 at 94). A man pressed on George's windpipe "real tight." (Ex. 1 at 86). George started to black out. (Ex. 1 at 87, 118). Then, George was tased four times. (Ex. 1 at 88, 95). As he was being tased, George was unable to move. (Ex. 1 at 91). He heard someone say, "the fucker is going to die," and the tasing stopped. (Ex. 1 at 91). (PS ¶ 13).

Before he was tackled, George never touched any of the officers. (Ex. 1 at 178). He did not say anything to them. (Ex. 1 at 178). The policemen handcuffed George and picked him up off the ground. (Ex. 1 at 95). When the ambulance came to take him to the hospital, George was not able to speak with the paramedics. (Ex. 1 at 106). In the hospital, George could not stop shaking. (Ex. 1 at 140, 152). His left hand was numb for a month. (Ex. 1 at 156). At the hospital, a policeman told him, "We thought you was gonna (*sic)* die." He also told George that the Taser used on George was "up to the max." (Ex. 1 at 127-8). The policemen, including Lopez, were not

---

[4] A "joint," in this context, is a marijuana cigarette. Merriam-Webster.com.

concerned about the fact that the Taser was up to the max; they were laughing and joking. (Ex. 1 at 128-9).  (PS ¶ 14).

The Taser left a hole in George's back.  (Ex. 1 at 132). He had puncture wounds from being tased.  (Ex. 1 at 173). He had scabs on his head.  (Ex. 1 at 147). George could not feel his legs; he was shaking, his throat hurt for two weeks.  (Ex. 1 at 151). Loretto Hospital did a charcoal wash of George's stomach. No narcotics were recovered.  (Ex. 5 at 46). Later, George was transported to Cook County Jail. There, he sweated for three days and sought medical treatment for a sharp pain on his left side.  (Ex. 1 at 145). (PS ¶ 15).

Lopez and Moussa claim that their actions occurred only because George's SUV did not have its headlights on, a non-violent traffic offense. (Exs. 3 at 81; 4 at 11). Yet, the POD video shows that George's headlights were on when Lopez' car approached George's SUV. (Exs. 7, 4 at 14-15).  (PS ¶ 16).

In March of 2011, Moussa and Lopez were assigned to the Chicago Police "mobile strike force" patrolling high-crime areas. (Exs. 2 at 11-12; 3 at 7-8). Lopez testified that, at 11:50 p.m. on March 10, 2011, he was in a patrol car going south on Laramie. (Ex. 3 at 18). Sgt. Cannon was driving and Lopez was in the front seat. Officers Pruger and Keaney were in the back seat. (Ex. 3 at 15-16). In another car directly behind them were Officers Moussa, Rashon and Bracho. (Ex. 3 at 16). (PS ¶ 17).

Lopez could not see around the corner as his car approached Quincy, as a building blocked his view. (Ex. 3 at 19). Nevertheless, he testified that he saw a black SUV with no headlights halfway down the block on Quincy. (Ex. 3 at 19, 20-21). According to Lopez, there was not enough room for two cars to traverse Quincy between the two rows of parked cars. (Ex. 3 at 23). (PS ¶ 18).

Lopez's car made a right turn onto Quincy and stopped, with the front of his car facing the front of the SUV. (Ex. 3 at 27, 28). The SUV went in reverse. (Ex. 3 at 25:24-26:4, 27:14). Lopez and Cannon jumped out of their car with weapons drawn; Lopez yelled "Stop the car." (Ex. 3 at 28, 29, 31). (PS ¶ 19).

After Lopez's car made a right turn onto Quincy, Moussa's car followed behind it. (28:14-17). Moussa testified that Lopez's car abruptly made a right turn onto Quincy. (Ex. 2 at 26-27). Lopez's car was about two car lengths into Quincy when it stopped. (Ex. 2 at 32). It was totally blocking the SUV. (Ex. 2 at 32). After turning onto Quincy, Moussa's car went about 10 to 15 feet and stopped. (Ex. 2 at 28-29). Moussa was sitting behind the driver, so, his vision of Quincy was partially blocked. (Ex. 2 at 28-29). (PS ¶ 20).

The only other vehicle Moussa saw in the driving lane of Quincy was "the top of a black SUV that the sergeant's car was in front of." (32:15-20). The sergeant's car was completely blocking the bottom of that black SUV; Moussa could only see the back of the sergeant's car and the top of the SUV. (32:21-33:3). Moussa was not able to see whether that black SUV had its headlights on. (33:4-7). (PS ¶ 21).

When Moussa's car stopped, Moussa saw Sgt. Cannon get out of the car and onto the sidewalk with his gun drawn. (30:2-17). After Cannon exited his car, there immediately came a flash message that a male black was running westbound on Quincy. (33:8-15). As soon as that flash message came out, Moussa's car backed out to Laramie to go around the block to pick up that pursuit. (35:1-5). There was no traffic; they proceeded quickly. (Ex. 2 at 36). Moussa's car stopped at the end of the block and all the officers got out. (Ex. 2 at 38). (PS ¶ 22).

Moussa ran down the middle of Quincy (Ex. 2 at 39). He went about 15 to 25 feet when he saw George running west on Quincy on the north sidewalk. (Ex. 2 at 38, 40). Lopez was running

right behind George. (Ex. 2 at 41). According to Moussa, as Lopez went to grab George, George turned around and punched Lopez in the face. (Ex. 2 at 43). George ran south to the opposite side of the street. (Ex. 2 at 43). Lopez grabbed George and the two went down on the sidewalk. (Ex. 2 at 49).  George was lying on his stomach. (Ex. 2 at 51). Moussa then tased George. (Ex. 2 at 53). (PS ¶ 23).

Lopez chased George down Quincy. (Ex. 3 at 37). According to Lopez, when he was halfway down the block, George went toward the north curb. (Ex. 3 at 42-43). Lopez saw Bracho, Rashon and Moussa at the end of Quincy, at the south sidewalk.  (Ex. 3 at 45, 47). He testified that, as he was trying to grab George, George turned around and punched him in the face with a closed fist. (Ex. 3 at 45, 48-49). The blow stunned Lopez and made him step back a couple of feet. (*Id.*). After striking Lopez, he pushed Lopez away, and ran across the street.  (Ex. 3 at 48, 49). (PS ¶ 24).

Lopez testified that he and George "tousled" and eventually fell to the ground.  (Ex. 3 at 54). Lopez yelled out that George put something in his mouth. (Ex. 3 at 56). He stated that he did not use force and that George was flailing on the ground.  (Ex. 3 at 60). George maintains that he was balled up and he was being punched, choked and tased. (Ex. 6b at 26). Lopez said that he never used force on George.  (Ex. 3 at 60). However, in his tactical response report, Lopez stated that he used an open-handed strike on George, which is a use of force. (Ex. 3 at 63). (PS ¶ 25).

Lopez testified that Moussa told George to stop resisting and then Moussa tased George. (Ex. 3 at 63). Then, he told George to "stop moving." After Moussa "drive stunned"[5] George, Lopez grabbed George's other arm and handcuffed him. (Ex. 3 at 71). (PS ¶ 26).

---

[5] A drive stun is where the Taser is held against the body without firing the projectiles. (Ex. 22, Cancel Dep. 17:21-23). Officer Moussa used the term "dry stun." The correct term is "drive stun" (*Id.* 17:13-18).

When Moussa tased George, he was four to five feet away from George. (Ex. 2 at 54). After tasing George three times, Moussa removed the cartridge from his Taser and did a "drive stun," where the Taser came into contact with George's flesh. (Ex. 2 at 67-9). The tasings paralyzed George. (Ex. 2 at 66-67). Lopez denied that he: put his hands on George's throat; struck George; hit George on the side of the head or choked George. (Ex. 3 at 67-68). (PS ¶ 27).

Moussa testified that the Taser's voltage was approximately 50,000 volts. (Ex. 2 at 55). A Taser tenses a person's muscles up; it renders a person incapacitated. (Ex. 2 at 56, 57). In police training, Moussa learned that tasing is appropriate when a person is an assailant or an active resistor. (Ex. 2 at 59). Moussa's training included being tased. (Ex. 2 at 66). (PS ¶ 28).

Moussa charged George with operating a car without the authority to do so, however those charges were dropped. (Ex. 2 at 90-92). He also charged George with reversing his car "nearly striking pedestrians and parked cars and then fleeing from a moving car." (Ex. 2 at 92). He admitted, however, that there were no pedestrians on Quincy that night and he knew that George's car was stopped when George left it. (Ex. 2 at 92-5). (PS ¶ 29).

Lopez filed criminal complaints against George alleging aggravated battery to a police officer (Exs. 8, 9) and resisting arrest. (Ex. 10). Moussa filed criminal complaints against George alleging reckless conduct nearly striking pedestrians (Ex. 11), criminal trespass to motor vehicle (Ex. 12), resisting arrest (Ex. 13) and a traffic ticket for no headlights. (Ex. 14). On March 24, 2011, a preliminary hearing was held based on these charges. (Def. Ex. I). Bail had been previously set at $100,000.00. (Ex. 17). These complaints were superseded by an Information dated March 28, 2011, wherein the State charged George with aggravated battery of a police officer. *See, e.g., Brown,* 2011 IL App (1st) 160025, at ¶ 7. (PS ¶¶ 30-31).

On February 7, 2012, George went to trial on the charge of aggravated battery. The court

found him not guilty of aggravated battery, but found him guilty of the lesser included offense of resisting arrest. Thus, even though George was only charged with aggravated battery, George was found guilty of resisting arrest and sentenced to 300 days, time served. (*Id.* at ¶ 9). He spent 11 months in Cook County Jail awaiting trial on the aggravated battery charge.  (Ex. 1 at 146). If George had not been stopped for the false reason of "no headlights" or if George had not been falsely charged with aggravated battery, he would not have spent 11 months in jail. (See, Ex. 19, Chicago Police Bail Bond Manual). (PS ¶ 32).

Based on the POD video, George petitioned to vacate his conviction, which was granted and a new trial was ordered. (*Brown,* 2011 IL App (1st) 160025, at ¶ 11; *see also,* Exs. 7, 21). George moved to quash his arrest based on the fact that it was illegal because the only reason given for stopping him was no headlights. (*Brown,* 2011 IL App (1st) 160025, at ¶ 12). At the hearing, Lopez testified that, when he turned down Quincy, there were two black SUVs; the first one had its headlights on, the second one did not. (Ex. 4 at 13-15). Despite the fact that at deposition, Lopez testified that there was not enough room for two cars to traverse Quincy between the two rows of parked cars (Ex. 3 at 23), at the motion to quash, Lopez testified that his car went around the first SUV and proceeded to George's SUV, which did not have its headlights on. (*Id.* at 12; *see also,* Ex. 4 at 15). Based on Lopez's testimony, the trial court found that the video did not establish that George's headlights were on. (*Id.* at 53-55). (PS ¶ 33).

On re-trial, the State never amended the Information, even though George was acquitted of aggravated battery and, the State proceeded to try George for resisting arrest. (*Id.* at ¶ 13). George moved to dismiss, on the basis that the State never amended the Information and the statute of limitations had run. Also, the Information only charged him with aggravated battery for striking Lopez in the face, from which he was acquitted. The trial court denied this motion. (*Id.* at ¶ 15).

(PS ¶ 34).

At the second trial, neither officer testified about encountering two black SUVs as the trial judge had ruled that the stop was no longer at issue. (*Id.* at ¶¶ 16, 17). Lopez did not recall whether he identified himself as a police officer. (Ex. 6a at 83). George filed a motion for a directed verdict, again contending that he could not be convicted of striking Lopez, the only charge in the Information, because he was acquitted of that offense. Nevertheless, the jury was instructed on the elements of resisting arrest. (*Id.* at ¶¶ 16, 17). (PS ¶ 35).

In reversing the trial court, the Illinois Appellate Court concluded that George went to trial on the only charge that he could never be convicted of committing, *to wit,* aggravated battery, noting that the State never amended the Information and George was never re-charged. (*Id.* at ¶¶ 46, 47). It also concluded that the jury should have been instructed on self-defense, as, an instruction on self-defense is required in a resisting arrest or battery case when the defendant presents some evidence of excessive force on the part of the arresting officer. (*Id.* at ¶¶ 50-54). After the Appellate Court remanded the matter, on September 15, 2017, the State *nolle prossed* it. (Defendants' Statement of Facts, Ex. H)). (PS ¶ 36).

**d.    Argument**

**1.    George was Wrongfully Detained for 334 Days, in Violation of his 4th Amendment Right to be Free from Unlawful Detention.**

The Defendants maintain the because George's Complaint invokes both the 4th and 14th Amendments to the U.S. Constitution, the 14th Amendment claim fails because a constitutional injury from a wrongful pretrial detention is only a 4th Amendment claim. *See, Manuel v. City of Joliet,* 137 S. Ct. 911, 918-20 (2017); *Lewis v. City of Chicago,* 914 F. 3d 472, 477 (7th Cir. 2019) (Defendants' Memo at 5-7)**.** However, George's Complaint was filed in 2012. *Manuel,* cited above, was decided in 2017. In any case, George's Complaint invokes the 4th Amendment. (*See*

10

Doc. 89, ¶ 68), which is violated when pretrial detention precedes or follows the start of legal process in a criminal case, as it prohibits governmental officials from detaining a person without probable cause. *Manuel*, 137 S. Ct. at 918.

The Defendants argue, that the "undisputed facts" establish that there was probable cause for George's pretrial detention. They thus seek to negate George's ability to state a 4th Amendment claim. (Defendants' Memo at 8). But, the only cause to stop George in the first place was the fabricated story that his SUV did not have its headlights on. One merely has to glance at the Appellate Court opinion in George's criminal case to know that, not only are there disputed facts, but, Lopez' and Moussa's accounts of what happened on March 10-11, 2011 are highly questionable. *See, People v. Brown,* 2017 IL App (1st) 160025 at ¶¶ 16, 31-37, 57. In fact, the Appellate Court concluded that "[T]here are reasons to believe . . . that the officers lacked a legal basis to arrest defendant." *Brown,* 2017 IL App (1st) 160025 at ¶ 38.

At a minimum, there are genuine issues of material fact here. George testified that the headlights to his SUV were on when it was blocked by Lopez' car. (Ex. 1 at 50-3; 117). The POD video corroborates George. (Ex. 7). Therefore, Lopez had no reason to stop George. (*See,* Ex. 3 at 81).

And, while George did run from Lopez, there is no evidence that the men in Lopez' car identified themselves as police officers. Indeed, Lopez could not state that he identified himself as a police officer. (Ex. 6a at 83). It was not until George was at the hospital that he discovered that Lopez was a police officer. (Ex. 1 at 178). Lopez' car did not have its Mars Lights on (Exs. 8 at 83; 167-70; 7). And, the men that jumped out of the car were dressed in black. (Ex. 6b, pp. 7-8).

The men in car beamed a blinding light on George, hampering his ability to see; George did not see Mars Lights or police car markings. *See, e.g., (*Exs. 1 at 66; 6 at 7, 8; 5 at 62). The men

11

in Lopez's car drew guns on George, in a crime-ridden neighborhood and yelled, "Get the fuck out of the car." (Ex. 1 at 64-66).

And, while Lopez testified, on the motion to quash arrest, that there was another SUV that went around his car, (at midnight on a narrow one-way street) with its lights on, he also testified that it was not possible for two cars to traverse that street. (Exs. 3 at 23; 4 at 5). Further, Lopez was in the passenger seat of his car that night; he could not see around the corner when his car proceeded down Laramie St. (Ex. 3 at 19). Yet, he claims to have seen a black SUV on Quincy with no headlights on halfway down the block. (Ex. 3 at 19, 20-21). At a minimum, genuine issues of material fact exist. Summary judgment must be denied.

## 2. George's Pretrial Detention was Unlawful.

The Defendants argue that, because George was charged with resisting arrest, a misdemeanor, George's pretrial detention for 11 months was lawful. They assert that, because George admitted that he ran from Lopez, Lopez and Moussa had probable cause to arrest, charge, prosecute and detain George for resisting arrest. (Defendant's Memo at 7-8). This argument ignores the law and the facts.

The charge for which George spent 11 months in Cook County Jail was aggravated battery. *See, e.g., Brown,* 2017 IL App (1st) 160025, ¶ 41. The initial charge of resisting arrest was dismissed and never re-charged. *Id.* The Defendants cite no law indicating that detention pending false charges is not actionable when it is established to be falsified. Indeed, they could not. *See, e.g., Manuel v. City of Joliet*, 903 F. 3d 667, 660670 (7th Cir. 2018); *Lewis,* 814 F. 3d at 476-77.

And, flight from an illegal stop does not relieve the Defendants from liability for the harm caused from the illegal stop. *See, e.g., Hardy v. City of Milwaukee*, 88 F. Supp. 3d 852, 878-79

(E.D. Wisc. 2015). Further, absent from this discussion is any liability for the physical and emotional harm that Lopez and Moussa caused. Lopez and Moussa remain liable for this harm.

Moreover, resisting arrest is defined by law as:

A person who knowingly resists or obstructs the performance *by one known to the person to be a peace officer,* firefighter, or correctional institution employee of any *authorized act* within his or her official capacity commits a Class A misdemeanor.

720 ILCS 5/31-1(a); emphasis added. The problem with the Defendants' argument is that George did not know these men were policemen. *See, e.g.*, (Exs. 5 at 61, 63; 1 at 178). Indeed, Lopez could not say that he identified himself as a police officer. (Ex. 8 at 83). And, although at the first criminal trial George testified that a police car and police officers turned the wrong way into Quincy, this statement must be put into the context of the trial, as prior testimony had already identified that car as a police car and the men as police officers. George was not asked if he knew at the time the car came around the corner that it was a police car or that the men dressed in black were police officers.

The case law cited by the Defendants does not aid them. In *People v. Jones,* 245 Ill. App. 3d 302, 304 (2nd Dist. 1993), officer Houde identified himself as a police officer. In *People v. Johnson,* 94 Ill. 2d 148, 154-160 (1983), the Illinois Supreme Court ruled that the police did not have probable cause to arrest Johnson. And, in *People v. Holdman,* 73 Ill. 2d 213, 221 (1978), the Illinois Supreme Court ruled that "flight from a clearly identifiable police officer *may, dependent upon the circumstances,* be sufficient probable cause for arrest." (Emphasis added).

The Defendants' arguments lack a legal or factual basis. Summary judgment must be denied.

**3.     There is Evidence that Lopez and Moussa Fabricated Evidence.**

The Defendants argue that George cannot prove that Lopez and Moussa fabricated evidence. (Defendants' Memo at 9). It is axiomatic that, upon summary judgment, a litigant need not prove his or her case. *See, e.g., Saccameno v. Ocwen Loan Servicing, LLC,* 2018 WL 124037 (N.D. Ill.) * 5-6. The Defendants, however, ignore the facts. Evidence fabrication implicates the 4th Amendment to the U.S Constitution when that fabrication is used to deprive a person of his or her liberty. *Lewis v. City of Chicago,* 914 F. 3d 472, 476-77 (7th Cir. 2019); *Avery v. City of Milwaukee,* 847 F. 3d 433, 439-40 (7th Cir. 2017). Lopez' and Moussa's "cover charges" for their unprovoked violence resulted in George being incarcerated for 11 months, (Ex. 1 at 146) thus, there is a deprivation of liberty.

There is direct evidence that Lopez fabricated the reason he stopped George, from George and from the POD video, (Ex. 7). George testified that he had his headlights on. (Ex.1 at 50, 52-3). According to Lopez, the only reason he stopped George was because his SUV did not have his headlights on.  (Ex. 3 at 81).

Additionally, as the Appellate Opinion in George's criminal case makes clear, Lopez's and Moussa's testimony as to what happened on the night of March 10-11, 2011 is implausible. *Brown,* 2017 IL App (1st) 160025 at ¶¶ 16; 31-38; 57. While Lopez testified that there was another black SUV with its headlights on going down Quincy, late at night, on a narrow, one-way street, which, his car went around, he also testified that there wasn't room for two cars on Quincy. (Ex. 3 at 23, 4 at 15). Also, Moussa testified that Lopez' car totally blocked George's SUV, making it highly unlikely that another black SUV would be able to get around Lopez's car. (Ex. 2 at 32). The Defendants' own testimony is evidence of fabrication. While Moussa's and Lopez' testimony at George's criminal trial may not subject them to liability (*see,* Section 5 herein), they certainly can be impeached with that testimony. Summary judgment must be denied.

14

4. **George was Harmed as a Result of Fabricated Evidence, as well as Lopez' and Moussa's Other Actions.**

The Defendants next argue that George did not suffer any harm resulting from Moussa's and Lopez's fabricated evidence because, according to the Defendants, George was found guilty of resisting arrest and not guilty of aggravated battery. They argue that because George was never convicted of aggravated battery, his claim of fabricated evidence regarding aggravated battery fails. They also assert that it is "undisputed" that George resisted arrest, so, his claim of fabrication with regard to the resisting arrest charge also fails. (Defendants' Memo at 9-11). This argument ignores the facts.

George has not been convicted. The first conviction for resisting arrest was vacated. *Brown*, 2017 IL App (1st) 160025 ¶ 11. The second conviction was set aside by the Illinois Appellate Court and remanded for a new trial. *Id.* at ¶¶ 59, 60. Instead of re-trying George the State's Attorney dismissed the case via a *nolle prosequi*.[6] There is no conviction for resisting arrest.

Pretrial detention based on false evidence violates the 4th Amendment, even when the criminal charges are dismissed. *Manuel,* 903 F. 3d at 668-70. Lopez not only lied about the headlights in the SUV, he also lied about being punched in the face. If Lopez had not lied, George would not have been charged with aggravated battery to a police officer and his bail would not have been $100,000.00. (See, Ex. 19, Chicago Police Department Bail Bond Manual). According to Ex.19, George would have received either a $1,500.00 bond or an I-Bond.

As is set forth in Section 3 herein, George spent 11 months in Cook County Jail as a result of in illegal stop, as George's SUV had its lights on and other fabricated evidence. As a result, George could not work, and, he lost his ability to be free in society. As the Illinois Appellate Court

---

[6] Latin for "we shall no longer prosecute." A declaration made to the judge by a prosecutor in a criminal case, meaning the case against the defendant is being dropped. dictionary.law.com

noted, it is highly doubtful that Lopez had any reason to stop George. *Brown,* 2017 IL App (1st) 160025 at ¶ 38.

Also, the Defendants overlook the fact that there is evidence here that Lopez and Moussa harmed George in addition to the fabricated evidence. George was tackled, punched and choked. (Ex. 1 at 78-79). He was punched in the head and choked several times.  (Ex. 1 at 78: 80-82; 83, 86). His windpipe was pressed "real tight."  He started to black out as a result of this violence. (Ex. 1 at 86, 87, 118). Then, Moussa tased George four times.  (Ex. 1 at 88, 95). Moussa used the maximum voltage on George, and a policeman told George when they were at the hospital "We thought you was gonna (*sic*) die." (Ex.1 at 127-8). Indeed, when George was being tased, an officer said "the fucker is going to die."  (Ex. 1 at 91). The Defendants' argument fails, thus precluding summary judgment.

**5.      Moussa and Lopez are Not Immune from Their Actions.**

The Defendants argue that Moussa and Lopez are absolutely immune for liability for their false testimony in George's criminal trials, citing *Briscoe v. LaHue,* 460 U.S. 325, 334-40 (1983). (Defendants' Memo at 11-12). However, a police officer who manufactures false evidence against a criminal defendant violates the U.S. Constitution, if that evidence is used to deprive that person in some way of his liberty. *Whitlock v. Brueggmann,* 682 F. 2d 567, 580 (7th Cir. 2012); *Starks v. City of Waukegan,* 946 F. Supp. 2d 780, 788-89 (N.D. Ill. 2012).

The Complaint here alleges, among other things, that: Moussa used excessive and unnecessary force on George by repeatedly discharging a Taser on George and he illegally stopped and seized George without probable cause of legal justification by discharging a Taser on him. (2nd Am. Complaint, Doc. 89, ¶¶ 70(a) and (b)); Lopez falsely charged George with aggravated battery; illegally stopped seized, searched and arrested George without probable cause or legal

16

justification; he carried out an illegal arrest and/or detainment of George; and, he had a reasonable opportunity to intervene and failed to intervene to stop Moussa from repeatedly tasing George. (*Id.* at ¶¶ 71(b), (d), (e) and (f)).

Lopez and Moussa charged George with criminal complaints for aggravated battery (Exs. 8, 9), criminal trespass to motor vehicle (Ex. 12), reckless conduct nearly striking pedestrians (ex. 11), resisting arrest (Exs. 10, 13). Even though these complaints were superseded by the Information charging aggravated battery to a police officer, these complaints led to the initial bond set at $100,000 and later to the Information. The false statement that George's car did not have its headlights on (Ex. 15, arrest report), and the false charge of aggravated battery to a police officer, initially made by Lopez resulted in George being incarcerated for almost one year. Therefore, the Defendants are not immune from liability.

Additionally, police officers are not immune from liability for withholding evidence. *Whitlock,* 682 F. 3d at 587-88; *Phillips v. City of Chicago,* 2018 WL 1309811 (N.D. Ill.) *25. If, as the Appellate Court concluded, the POD video reflected the encounter between Lopez' car and George's SUV, (*Brown,* 2017 IL App (1st) 160025, ¶ 38) Lopez and Moussa withheld evidence as to what truly happened. Finally, nothing argued by the Defendants prevents George from having a jury hear Lopez's and Moussa's prior testimony and assess their credibility. Summary judgment must be denied.

**6.    Contrary to their Assertions, the Defendants' Actions Constitute Intentional Infliction of Emotional Distress ("IIED").**

The Defendants argue that their actions were not severe enough to constitute IIED. (Defendants' Memo at 12-14). It is true that, to constitute IIED, a person's behavior must be intentional and extreme. *See, e.g., Feltmeier v. Feltmeier,* 207 Ill.2d 263, 269-75 (2003); *Guerra*

*v. Hunger,* 1998 WL 246399 * 1, 4-5 (N.D. Ill. 1998). However, the Defendants overlook the facts and Illinois law.

George was tackled, choked and punched. (Ex. 1 at 78-79). He was punched in the head and choked several times. (Ex. 1 at 78: 80-82; 83, 86). His windpipe was pressed "real tight;" he started to black out as a result of this violence. (Ex. 1 at 86, 87, 118).

Then, Moussa tased George. (Ex. 1 at 88, 95). At that time, George was lying on the ground; he was no threat to anyone. (Ex. 2 at 51). Moussa received police training where he was tased. (Ex. 2 at 66). He knew the amount of pain he inflicted on George and he tased George four times. (Ex. 1 at 88, 95). Moussa used the maximum voltage on George, and a policeman told George when they were at the hospital "We thought you was gonna (*sic*) die." (Ex.1 at 127-8). Indeed, when George was being tased, an officer said "the fucker is going to die." (Ex. 1 at 91). Lopez' and Moussa's conduct was severe and it was intentional.

Much less egregious conduct has been found to constitute IIED. For example, in *Pavlik v. Kornhaber*, 326 Ill. App. 3d 731, 736-38; 743-46 (2nd Dist. 2001), a cause of action for IIED was found to lie for repeatedly making sexually explicit remarks. In *Pilotto v. Urban Outfitters West, LLC,* 2017 IL App (1st) 16044, ¶ 17, the plaintiff's allegations that she was refused access to a public bathroom was found to state a cause of action for IIED.

The Defendants ignore their conduct and focus, instead, on George's reactions to their conduct at the time of his deposition, which was taken approximately a year and a half after the incident. In support, they rely on *Weston v. Advocate Christ Med. Ctr.,* 2016 IL App (1st) 150935-U. However, *Weston,* an Illinois case, is an unpublished opinion. As such, pursuant to Illinois law, it has no precedential value. Ill. S. Ct. Rule 23(e). Therefore, applying Illinois law, this Court cannot consider it.

Of greatest importance is that Illinois law provides that it is a defendant's *conduct* that is important, not whether it left lasting emotional scars. *See, e.g., Feltmeier,* 207 Ill. 2d at 267-71; *Guerra*, 1998 WL 246399 at *1, 4-5. The Defendants ask this Court to ignore Illinois law. In effect, they also ask this Court to assess the amount of damage they caused which is not appropriate for summary judgment. This Court must deny summary judgment.

**7.      Lopez and Moussa Assaulted George.**

The Defendants assert that they never threatened George before they used force on him and George did not allege that he had an opportunity to apprehend a battery, and thus, according to the Defendants, George cannot claim that he was assaulted. (Defendants' Memo at 14-15). This argument distorts the facts.

An assault occurs when the defendant places the plaintiff in reasonable apprehension of being battered. *Smith v. City of Chicago,* 143 F. Supp. 3d 741, 760-61 (N.D. Ill. 2015). When Lopez first stopped George by blocking his SUV, the officers beamed a very bright light on George; he could not see. (Ex. 6 at 7, 8, 27). They did not identify themselves as police officers and they did not activate their car's Mars Lights. (Exs. 1 at 58; 67; 66, 178; 5 at 63). Indeed, Lopez testified at the criminal trial that he could not remember if he identified himself as a police officer. (Ex. 8 at 83). The officers had their guns drawn, pointed straight at George.  (Ex. 5 at 62). Pointing a gun at a person is an assault.

George, being in a crime-ridden neighborhood just short of midnight, (Ex. 3 at 11; 1 at 50) and unaware of who was yelling at him from the car that blocked his SUV, panicked and ran from his car.  (Ex. 1 at 58, 67). By pointing his gun at George, Lopez placed George in reasonable apprehension of imminent battery. Also, by punching George in the head, battering and choking George (Ex. 1 at 78-83, 86), Lopez placed George in fear for his life.

Additionally, Moussa placed George in reasonable apprehension of battery. While tasing George, Moussa placed George in fear for his life. The statement "the fucker is going to die" made by a policeman on the scene, (Ex. 1 at 91) is ample evidence that Moussa not only placed George in harm, but, he placed George in fear of dying. The Defendants' argument ignores the facts. Summary judgment must be denied.

**Conclusion**

**WHEREFORE,** for the reasons stated herein, the Plaintiff, George Brown, respectfully requests that this Court deny the Defendants' Motion for Summary Judgment in its entirety.

**GEORGE BROWN**

*s/ Peter V. Bustamante*

_____

Peter V. Bustamante
17 North State Street - Suite 1550
Chicago, Illinois 60602
(312) 346-2072
pvbust@bustamantelaw.com